# EXHIBIT A



# MILLS & Co.

### ─ S O L I C I T O R S ─

Milburn House, Dean Street
Newcastle upon Tyne, NE1 1LE
Telephone: +44 (0) 191 233 2222  Fax: +44 (0) 191 233 2220
E-mail: firstname.lastname@mills-co.com

Your Ref:

Our Ref:   GBM/BB

24th November 2015

Simon Gault
Field Farm
Iden Green
Benenden
TN17 4HF

Mark Hamsher
18c Ensign Street
London
E1 8JD

Dear Sirs,

### Naiad Maritime Co, Majuro Marshall Islands v Pacific Gulf Shipping Company Ltd
### C/P dd. 21/8/15 – Claim Submissions

We should be grateful if you would treat the submissions below, and accompanying Appendices and paginated and tabbed bundle of relevant documents (the "Bundle"), as the Claim Submissions of the Claimants Naiad Maritime Co, Majuro Marshall Islands (the "Owners") against the Respondents Pacific Gulf Shipping Company Ltd  ("the Charterers") in this reference.

### The Charterparty

1.  By a time charterparty evidenced by a fixture recap timed at 13.19hrs on 21 August 2015 (the "Recap") (Bundle pp 1-11) and incorporated Achilleas S/PGSC charterparty on an amended NYPE form dd 24/04/2014 (the "Charter Terms") (Bundle pp 12-45) (collectively the "Charterparty") the Owners time chartered their vessel "Marylisa V" (the "Vessel") to the Charterers for one time charter trip via Indonesia (int Padang) to load

harmless Palm Kernel Shells in bulk only for discharge Baltic (int Poland), duration abt 60 days WOG, on the terms of the Charterparty to which Owners will refer as may be necessary for its full terms, meaning and effect.

## Contractual Description - Harmless Palm Kernel Shells

2.   The Charterparty at paragraph 5 of the Recap expressly provided, amongst other matters:-

"5. One time charter via Indonesia (int Padang) to load harmless Palm Kernel Shell in bulk only.....
.....
Only cargo permitted is hless palm kernel Shells group 'C' to be loaded/ stowed/ carried / trimmed if necessary/ discharged in compliance with imo/ solas/ and all other applicable international regulations, including the imsbc code 2013 and any later amendments thereto.
prior to loading, shippers to provide a cargo declaration and msds similar as attached of last vsls which to include oil + moisture content."

3.   In the premises:-

(1) The contractual description of the cargo to be loaded (which was an express condition of the Charterparty), was "harmless Palm Kernel Shells group 'C' ".

(2)  "Harmless Palm Kernel Shells group 'C' " was the only cargo that the Charterers were contractually entitled to order Owners to load and carry, and that Charterers were entitled to load and ship on board the Vessel.

(3) It was an express condition of the Charterparty, and the Charterers expressly warranted and guaranteed, that the cargo to be carried was "harmless" (and accordingly was not dangerous).

4.   The Charterparty further provided:-

(1) "Rider clauses

.....

Clause 58: As per main terms agreed." (Recap paragraph 13)

(2) "**Clause 58. Cargo Exclusions**

Notwithstanding the provisions of this charter, all commodities and goods of any type which, as at the date of intended loading appear in the IMDG Code and/or IMSBC Code are excluded unless the ship is equipped to comply with the relevant carrying conditions as stipulated by the above mentioned codes.
For the avoidance of doubt all cargoes to be carried in accordance with IMO/IMSBC Code regulations and local regulations and to the extent that local regulations are more onerous/restrictive than those under IMO/IMSBC Code. Charterers to pay for all expenses, consequences and time lost due to and or in connection with the carriage of Charterers intended carriage of such commodities or goods. Any extra fittings/equipment, etc which are required to observe such regulations are to be undertaken by Charterers at their time and expense."

(Charter Terms Clause 58)

## General Clause Paramount and application of the Hague-Visby Rules

5.  The Charterparty further provided in the Charter Terms :-

(1) "Clauses 29 to 108 both as attached hereto, are deemed to be fully incorporated in this Charter Party, ..... BIMCO Arbitration Clause.....BIMCO General Clause Paramount...as attached hereto are considered fully incorporated in this Charter Party And all Bills of Lading issued during the currency of this Charter Party."

(2) "**BIMCO GENERAL CLAUSE PARAMOUNT**

The international Convention for the unification of certain rules of law relating to Bills of Lading signed at Brussels on 25th August 1924 ('the Hague Rules') as amended by the  protocol signed at Brussels on 23 February 1968 ('the Hague-Visby Rules') and as enacted in the country of shipment shall apply to this contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments. When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract. The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatory or by this contract. The carrier shall in no case be responsible for loss or damage to the cargo arising prior to loading, after discharging, or while the cargo is in charge of another

carrier, or with respect to deck cargo and live animals."

## The Dangerous Cargo Clause

6.  In the premises the Charterparty incorporated the Hague-Visby Rules, and accordingly the Charterparty further provided pursuant to Article IV r.6 thereof (referred to herein as the " Dangerous Cargo Clause"):-

   **"Article IV**

   .....

   6.  Goods of an inflammable, explosive, or dangerous nature to the shipment whereof the [Owners], master or agent of the [Owners], has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place or destroyed or rendered innocuous by the [Owners] without compensation and [the Charterers] shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment. If any such goods shipped with such knowledge and consent shall become a danger to the ship or cargo, they may in like manner be landed at any place, or destroyed or rendered innocuous by the [Owners] without liability on the part of the [Owners] except to general average, if any".

## The Dangerous Cargo Implied Term

7.  Further it was an implied term of the Charterparty (such term to be implied in law) (hereinafter referred to as the "Dangerous Cargo Implied Term") that:-

   (1) any cargo that Charterers ordered and directed to be loaded and carried under the Charterparty was fit and safe for loading and carriage in the ordinary way, and/or

   (2) that the Charterers would not order and direct the Owners to load goods which were dangerous without giving express notice of the same to Owners.

## The Implied Indemnity

8.  The Charterparty provided at Clause 8 of the Charter Terms, amongst other matters, that:-

"...The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, lash/unlash, stock, secure/unsecure and trim, tally and discharge the cargo at their risk and expense under the supervision of the Captain, who is to sign or to authorise Charterers' Agents to sign Bills of Lading for cargo, in conformity with Mate's or Tally Clerk's receipts (Draft copy of same having previously been sent to owners. See clause 65) "

9.  In the premises the Charterers agreed to indemnify the Owners against loss or damage suffered and/or liability incurred by the Owners as a consequence of complying with the Charterers' orders or directions as aforesaid (hereinafter referred to as the "Implied Indemnity").

10. The Charterparty further provided, in the Recap, amongst other matters as follows:-

"3. Dely AFSPS Singapore ATDN SHINC
......
6. Redely SP Poland PICO after completion discharge ATDN SHINC

7. Daily hire US$ 4,000 daily for the first 65 days
                US$8,000 daily for the balance
inclot payable in advance in US Dollars to owners nominated account free of any bank charges. Charterers to pay on delivery 45 days hire, CVE, ILHC. No bunkers payment on delivery.
2nd hire payment up to the expected redely

1st hire to be paid w/i 2 banking days after vsls delivery (owners to issue an invoice on their letter head for hire payments) but in any case prior issuing any b/l's.

8. Charterers to redeliver vessel with unclean holds against payment ILHC - us$ 5,000.00 which to be paid prior together with first hire.
CVE as per CP but usd 650

9. Fuels on delivery as on board estimated to be hsifo abt 480/550 mt and is mgo abt 60/75 mt, fuels on redelivery same quantities of each grade as actually delivered with. Prices bends: hsifo usd 285 pmt and lsmgo usd 525 pmt.
No payment for bunkers on delivery but any minor adjustment on redelivery to be made together with last hire prior to redelivery, irrespective of other accountancy matters.
Owners liberty to bunker at any time during the currency of this cp. Any time actually lost to be for owners account.
.....

12. GA/ Arbitration to be in London and English law and English jurisdiction to apply. BIMCO Dispute Resolution Clause 2015 to apply (with small claims arbitration procedure to apply for claims upto US$50,000 excluding Legal costs.
Bills of Lading to be governed by English law and English jurisdiction to apply.

13. Owise as per Achilleas S/PGSC cp dd 24/04/2014"

11. The Charterparty further provided, in the Charter Terms, amongst other matters as follows:-

"2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges customary and/or compulsory Pilotages, And watchmen Agencies, stevedores, tallymen, compulsory garbage removal, boatage except for the crew, towage, canal dues, municipality Or state tax Commissions, Consular Charges (except those pertaining to the   Crew), and all other usual expenses except those before stated...
.....

4. That the Charterers shall pay for the use and hire of the said Vessel....commencing on and from the hour of the day of her delivery...hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost)....
.....

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing.....
.....

Clause 70. BIMCO Arbitration Clause
(A) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration  in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when arbitration proceedings are commenced.
The reference shall be to three arbitrators.....
.....

Clause 81
This Charter Party to be interpreted in accordance with English Law.
.....

Clause 106 - BIMCO Hull Fouling Clause for Time Charter Parties
(a) If, in accordance with Charterers' orders, the Vessel remains at or shifts within a place, anchorage and/or berth for an aggregated period exceeding:
(i) a period as the parties may agree in writing in a Tropical Zone or Seasonal Tropical Zone*; or

(ii) a period as the parties may agree in writing outside such zones*

Any warranties concerning speed and consumption shall be suspended pending inspection of the Vessel's underwater parts including, but not limited to, the hull, sea chests, rudder and propeller.

* if no such periods are agreed the default periods shall be 20 days.

(b) In accordance with sub-clause (a), either party may call for inspection which shall be arranged jointly by Owners and Charterers and undertaken at Charterers' risk, cost, expense and time.

(c) If, as a result of the inspection either party calls for cleaning of any of the underwater parts, such cleaning shall be undertaken by the Charterers at their risk, cost, expense and time in consultation with the Owners.

(i) Cleaning shall always be under the supervision of the Master and in respect of the underwater hull coating, in accordance with the paint manufacturers' recommended guidelines on cleaning, if any.

Such cleaning shall be carried out without damage to the Vessel's underwater parts or coating.

(ii) If, at the port or place of inspection, cleaning as required under this Sub-clause (c) is not permitted or possible, or if Charterers choose to postpone cleaning, speed and consumption  warranties shall remain suspended until such cleaning has been completed.
...

(d) Cleaning in accordance with this clause shall always be carried out prior to redelivery. If, nevertheless, Charterers are prevented from carrying out such cleaning, the parties shall, prior to but at the latest on redelivery, agree a lump sum payment in full and final settlement of Owners' costs and expenses arising as a result of or in connection with the need for cleaning pursuant to this clause.

(e) If the time limits set out in Sub-clause (a) have been exceeded but the Charterers thereafter demonstrate that the Vessel's performance remains within the limits of this Charter Party the vessel's speed and consumption warranties will be subsequently reinstated and the Charterers' obligations in respect of inspection and/or cleaning shall no longer be applicable."

## Factual Background

12. The Vessel was delivered into the Charterers' service at 05.30hrs local time on 31st August 2015 (Bundle pp 46).

13. Pursuant to Charterers' orders and directions (Bundle pp 47-57) the Vessel proceeded to the Port of Teluk Bayur, Pedang Indonesia to load, and thereafter loaded, a part cargo of palm kernel shells (the "Cargo").

14. The Vessel dropped anchor at 2100hrs on 4 September 2015, and was alongside to jetty Pier 102, Teluk Bayut at 19.58hrs on 8 September 2015.

15. The IMSBC Code -Shipper Declaration of PT Bumi Widorokandang dated 7 September 2015 in respect of part of the cargo to be loaded, as supplied to Owners, provided, amongst other matters (Bundle pp 58):-

(1)   The shipper was identified as PT Bumi Widorokandang ("Shippers BW").

(2)   In the box headed "Characteristic" it was stated, amongst other matters:

    (i)   adjacent to the heading "Characteristic", "p.k.s is not included into IMSBC Code"

    (ii)   Bulk Cargo Shipping Name: "PALM KERNELS SHELLS AS BIOMASS FUEL IN BULK"

    (iii)   Gross Masse: "3,000 MT"

    (iv)   Group, " C "

(3)   In the box headed "Hazard" it was stated, amongst other matters:-

"
No Special Hazards

No Auto-ignitible and low risk evan at open flames

No need CO2 System"

(4)   In the box headed "WEATHER PRECAUTIONS" it was stated "PKS might be wet due to rain; it does not harm its quality..."

(5)   In the box headed "Declaration" it was declared:

"I hereby declare that the consignment is fully and accurately describe and that the given test result and other specification are correct to the best of my knowledge and belief and can be considered as representative for the cargo to be loaded."

16. The IMSBC Code -Shipper Declaration of PT Jetim Propertindo Jaya dated 10 September 2015 in respect of part of the cargo to be loaded, as supplied to Owners (replacing a materially identical declaration of a lesser quantity dated 3 September 2015 (Bundle pp 58a)), provided, amongst other matters (Bundle pp 59):-

    (1)    The shipper was identified as PT Jetim Propertindo Jaya ("Shippers JPJ").

    (2)    In the box headed "Characteristic" it was stated, amongst other matters:
        (i)    adjacent to the heading "Characteristic", "(PKS) is not included into IMSBC Code"

        (ii)    Bulk Cargo Shipping Name: "PALM KERNEL SHELL (PKS) IN BULK"

        (iii)   Gross Masse: "39,450 TNE"

        (iv)   Group, " C "

    (3)    In the box headed "Hazard" it was stated, amongst other matters:-

    "
No Special Hazard
No Auto-ignitible and low fire-risk even at open flames
No need CO2 System"

    (4)    In the box headed "WEATHER PRECAUTIONS" it was stated "PKS might be wet due to rain; it does not harm its quality..."

    (5)    In the box headed "Declaration" it was declared:

    "I hereby declare that the consignment is fully and accurately described and that the given test result and other specification are correct to the best of my knowledge and belief and can be considered as representative for the cargo to be loaded."

17. According to the IMSBC Code (to which Owners will refer as may be necessary), "Group

C consists of cargoes which are neither liable to liquefy (Group A) nor to possess chemical hazards (Group B)."

18. Shippers JPJ provided to Owners a MSDS ("Material Safety Data Sheet") dated 31 August 2015 (Bundle pp 60-64) in respect of cargo to be shipped by them, and Shippers BW provided to Owners a MSDS dated 03 September 2015 (Bundle pp 65-68) in respect of cargo to be shipped by them. The said Material Safety Data Sheets, to which Owners will refer, as may be necessary, identified the moisture content of the cargo as 22%. Various other MSDS's were provided to Owners subsequently. No admissions are made by Owners as to the actual moisture content of the Cargo, various moisture figures having been given by the shippers (most in excess of 20%), the Owners having no means of ascertaining the actual moisture content of the Cargo. Neither MSDS identified that the Cargo to be loaded was, as appears below, dangerous.

19. At no material time (namely before loading) did the Charterers give notice to the Owner or the Master that the Cargo was, as appears below, dangerous.

20. In reasonable reliance upon the terms of the Charterparty (in particular paragraph 5 of the Recap, the Dangerous Cargo Clause and the Dangerous Cargo Implied Term), and the matters pleaded above, Owners loaded the Cargo pursuant to Charterers' orders as aforesaid.

**Loading Operations**

21. In this regard, and after initial draft surveys, and cargo hold inspections, during which the cargo holds were found to be clean, dry and suitable for loading, the Vessel commenced loading cargo at 22.10hrs on 8 September 2015.

22. Loading initially commenced in hold nos. 1 and 2, thereafter loading commenced in hold no.3 at 22.15hrs and hold no.4 at 22.35hrs. At 22.45hrs loading also commenced in hold no.5.

23. At 23.50hrs on the evening of 8 September, the Master advised the local agents, as was the case, that steam was noted to be rising from the cargo being delivered by trucks to the Vessel. The Vessel's crew recorded the temperature of the cargo being loaded using a hand held infra red measuring device with temperatures of approximately 39°Celsius. The Master was repeatedly advised by the local agents that this was normal for this cargo.

24. On the morning of 9 October, at 08.00hrs the Vessel's crew noted that water was draining from the cargo in the holds. The Master informed the local agents who advised that this was normal for this cargo (Bundle pp 69).

25. At 00.10hrs on 12 September the Master stopped the loading due to water being seen falling from the trucks bringing the cargo to the Vessel. Loading resumed at 13.15hrs that day, when the shippers supplied cargo with no visible moisture being present.

26. On 15 September the Master issued a Letter of Protest to, amongst others Shippers BW and Shippers JPJ, with copy to Charterers, headed: "Re Steam / smoke coming out from the cargo." and which provided:

"On behalf of my Owners and Charterers I here-by note protest due to the steam / smoke coming out from the cargo Palm Kernel Shell being loaded on board Mv Marylisa V.
This might indicate too much moisture/ water in the cargo or sign of burning.
Cargo temperature ranges from 38 to 45 degrees.
I therefore reserved the right of my Owners and Charterers to refer to this matter at some later date and take such action, or any claims as they may deem necessary."

27. Loading continued until 18.10hrs on 16 September at which time the vessel had reached its maximum sailing draft at the berth of 8.70metres.

28. On the basis of the draft survey, the Cargo loaded on board the Vessel totalled 32,670.59MT distributed in the cargo holds as follows:-

| Hold | 1 | 2 | 3 | 4 | 5 |
|------|------|------|------|------|------|
| Cargo mt | 9,804.86 | 12,904.36 | 11,972.38 | 10,487.58 | 8,485.92 |

29. After the final draft survey, the Vessel cleared the berth at 20.10hrs on 16 September, and proceeded to the anchorage area to await instructions for loading the final parcel of cargo, said to be approximately 3,700 MT, from barges. The anchor was dropped at 21.25hrs that evening.

## Gas and Temperature Readings

30. Throughout loading, cargo temperatures at the surface of the stow showed a continuous increase. The highest cargo temperature recorded by infrared thermometer before the hatches were closed was 67.4°C in hold no.1. In all likelihood temperatures inside the stow, below the surface, will have been much higher by this stage. In accordance with good seamanship the hatch covers and ventilators were closed on 17 September. Stopping ventilation in such circumstances also accords with the approach to be adopted under the IMSBC Code in relation to self-heating cargoes (for example in relation to "seed cake"'' the IMSBC Code requires that ventilation must be stopped when cargo temperatures reach 55°C and continue to rise).

31. Cargo hold gas and temperature readings were taken by the crew on the evening of 17 September. These readings showed that the oxygen level was falling, the carbon monoxide level was rising, and that the hold atmosphere in each hold contained high levels of flammable gas (in excess of 100% Lower Explosive Limit ("LEL")). Further readings taken over the course of the next day, 18 September, recording rapidly descending $O_2$ levels, down to below 3% in most holds within 24 hours, rapidly rising flammable gas levels, above 100% LEL in all holds.

32. The cargo hold temperature readings taken from the hold temperature sounding pipes recorded that the temperature was rising in all holds. By 20 September the temperature in hold no.1 was recorded as 62°C, with the temperature in the remaining cargo holds ranging from 47°C to 56°C. Measuring temperatures through the sounding pipes is the only possible method at times when hatch covers are closed, but this method inevitably underestimates temperatures within the stow as the readings are taken against the bulkhead where the cargo is likely to be the coolest, as opposed to the centre of the stow where the

temperature is likely to be at its highest.

33. Since the hatch covers were closed on 17 September gas levels have been monitored three times daily with the readings witnessed by surveyors from Pt. Pandi Nusa Inspektor of Jakarta and Matthew Davies surveyors of Jakarta, Indonesia, as well as surveyors from Brookes Bell Hong Kong and Minton, Treharne & Davies Asia. These readings are shown in Appendix 1 hereto.

(1) **Flammable gas (LEL)** - Readings of flammable gas inside the holds have been above 100% LEL at all times. This is the maximum read-out for conventional gas meters. A specialised gas meter (Dräger X-am 7000 which can measure concentrations of flammable gases in low-oxygen environments using an Infrared sensor) was obtained by sub-charterers' surveyors and first used on 29 September. By way of example, on that date flammable gas levels in the holds were found to be between 16.4%Vol and 35%Vol. On the basis (as seems likely on balance of probabilities) that the flammable gas is methane, methane has a LEL of 4.44% and such readings correspond to 370%LEL to 795% LEL which are extremely high flammable gas levels. Since 9 October, Owners' surveyors (Brookes Bell) have also placed on board a gas meter (Riken Keiki GX-2012) capable of measuring flammable gases in low-oxygen environments, using a thermal conductivity sensor. The Dräger and Riken Keiki gas meters have shown agreement in terms of flammable gas levels. Daily gas measurements have shown a continuing gradual increase of flammable gas levels in each hold, with readings on 16 November between 29%Vol and 41%Vol. Additional direct confirmation of the flammable nature of the in-hold gases was obtained by a qualitative flame test conducted on board on 15 November in the presence of surveyors and representatives of all parties. A self-sustaining blue flame was produced by igniting a controlled flow of in-hold gas released from a pressure bottle through a nozzle.

(2) **Pressure build-up** - The gas pressure inside the holds has been highly variable with periods of strong overpressure inside the holds which presents a risk of the hatchcovers lifting off and/or deforming, which would itself result in the Vessel being

unseaworthy and would result in oxygen ingress and an additional fire and explosion hazard. In consequence it has been necessary to vent off excess gases periodically - itself a process that carries an explosion risk, as the gas admixes with the outside air.

(3) **Oxygen (O₂)** - Oxygen levels have remained close to zero (0%) in all five holds. By excluding oxygen further oxidation of the cargo and self-heating is minimised reducing (but not eliminating) the fire and explosion risk.

(4) **Carbon monoxide** - levels of carbon monoxide have reduced over time as oxygen has become depleted (preventing further production of CO), but levels as at the end of September (well above 100ppm and possibly as high as 500ppm depending on the gas meter used) were still very high consistent with cargo self-heating leading to the risk of fire. By way of comparison, the IMSBC Code states that CO levels above 50ppm in coal may indicate a self-heating situation (with the potential to lead to a cargo fire).

34.   Cargo and fire experts instructed on behalf of Owners (Brookes Bell Hong Kong), Charterers (CWA International Ltd, London) and Sub-Charterers (Minton Treharne & Davies (MTD) Asia are of agreement that the Cargo is not safe for carriage in the above circumstances, and on 29 September 2015 issued written "Discharge Recommendations with Flammable Gases and Self Hearing Cargo" in relation to the discharge of the Cargo (Bundle pp 70-73). The full severity of the risk posed by the flammable gas levels became known only thereafter (see 33(1) above), and accordingly the experts subsequently issued revised written recommendations on 16 October (Bundle pp 74-78).

35. As at 24th November 2015 the Cargo remains on board the Vessel pending agreement arrangements for its discharge in circumstances where it remains unsafe for carriage.

**Hire and Balance of Account**

36.  As at the date hereof there is due and owing by the Charterers to the Owners on a balance of account in respect of hire and other sums due from Charterers to Owners the total sum

14

of US$278,204.48 as particularised in Appendix 2 hereto. Sums continue to fall due in respect of such matters, and Owners will update the aforesaid particulars on a periodic basis.

37. Wrongfully and in breach of the Charterparty the Charterers have failed and/or refused to pay the aforesaid sums or any part thereof, and the same remains due and owing from the Charterers to the Owners.

## Indemnity under Clause 8

38. Pursuant to Clause 8 of the Charterparty, the Owners are entitled to claim, and claim, an indemnity in respect of the loss and damage they have suffered (as particularised in paragraph 45 below and in Appendix 3 hereto) and in respect of such liability as they may have incurred and/or may incur to any entity or individual the same having been suffered and/or incurred by reason of Owners' compliance with Charterers; orders and/or directions as aforesaid.

## Breaches of the Charterparty

39. Wrongfully and in breach of the Charterparty and the contractual description of the contractual cargo in paragraph 5 of the Recap, the Cargo that Charterers ordered the Owners to load, and which was loaded by the Vessel pursuant to Charterers' orders, did not conform with its contractual description, namely harmless Palm Kernel Shells group 'C', and as such is not a contractual cargo. In this regard:-

(1) The Cargo is not harmless, and cannot properly be described as such, and/or

(2) The Cargo is not harmless Palm Kernel Shells group 'C', and/or

(3) The Cargo is not a group 'C' cargo, and/or

(4) The Cargo is dangerous.

(5) Owners repeat paragraph 33 above and paragraph 41 below in support of its pleas at sub-paragraphs (1) to (4) above.

40. On 18 September 2015, in an email from Mills & Co on behalf of Owners to Charterers (Bundle pp 79), as repeated in further messages from Owners to Charterers on 24 September and 25 September (Bundle pp 80-81) Owners called upon Charterers to discharge the non-contractual Cargo which did not comply with its contractual description as aforesaid. Wrongfully, and in breach of the Charterparty, the Charterers have at all times thereafter failed and/or refused to do so.

41. Further or alternatively, in breach of the Charterparty and in particular the Dangerous Cargo Clause and/or the Dangerous Cargo Implied Term the Cargo is a dangerous cargo and/or is not fit and safe for carriage in the ordinary way.

PARTICULARS

(1) The Cargo is liable to, and is, giving of flammable gases which gives rise to the risk of an accumulation of flammable gases and formation of an explosive and/or inflammable mixture which is liable to ignite spontaneously and/or if exposed to a source of ignition and/or

(2) Those flammable gases are at and above 100% LEL in each hold which gives rise to the risk of explosion and/or fire, and endangers the safety of the Vessel, its crew and cargo, and/or

(3) The flammable gases being given off give rise to the risk of, and has given rise to, a strong over pressure in the holds which presents a risk of hatch covers lifting off and/or deforming thereby exposing the Vessel to the possibility of damage and unseaworthiness, and creating a heightened fire and/or explosion risks on admission of oxygen, and/or

(4) The Cargo is liable to, and is, self-heating giving rise to the risk of explosion and/or fire, and/or

(5) The Cargo is, in fact a hazardous cargo, within the IMSBC Code, properly categorized as a Group B cargo (cargoes which possess a chemical hazard which could give rise to a dangerous situation on a ship) under the schedules for SEED CAKE, UN 1386 (a) or (b), Class 4.2, i.e. a cargo liable to self-heating and spontaneous ignition, alternatively the Cargo is not listed in the IMSBC Code and therefore only permitted for carriage with a special certificate from the Competent Authority of the port of loading "stating the characteristics of the cargo and the required conditions for carriage and handling of this shipment" (IMSBC Code, para. 1.3.2), and no such certificate was supplied, and/or

(6) In any event, because of the unexpected development of very high levels of flammable gas, the cargo is dangerous beyond the hazards identified in the SEED CAKE, UN1386 (a) or (b) schedules referenced above, and beyond what could reasonably have been authorised for carriage in bulk by the Competent Authority under Section 1.3 of the IMSBC Code, and cannot be carried safely in bulk under the provisions identified in any existing IMSBC Code schedule, or at all, and/or

(7) In the above circumstances the Cargo is not fit and safe for loading and carriage in the ordinary way.

42. Further or alternatively, and in breach of the Charterparty, the Charterers ordered the Owners to load a dangerous cargo without notice of the same to Owners. Owners repeat the particulars given under paragraph 41 above.

**Declaration in relation to the Cargo under the Dangerous Cargo Clause**

43. Further or alternatively, the Cargo was of an inflammable and/or explosive and/or dangerous nature, and the shipment thereof was not consented to by the Owners or Master

with knowledge of the Cargo's nature and character, and accordingly the Cargo may be landed at any place and/or destroyed and/or rendered innocuous by the Owners without compensation, and Owners seek a declaration to such effect.

## Indemnity under the Dangerous Cargo Clause

44. Further or alternatively, the Cargo was of an inflammable and/or explosive and/or dangerous nature, and the shipment thereof was not consented to by the Owners or Master with knowledge of the Cargo's nature and character, and accordingly Charterers are liable to Owners pursuant to the Dangerous Cargo Clause for all damages and expenses directly or indirectly arising from such shipment as to which Owners repeat paragraphs 45 and 46 below, and Owners claim a declaration to such effect.

## Damages

45. By reason of Charterers' breaches of the Charterparty as aforesaid Owners have suffered loss and damage. At the time of commencement of this arbitration Owners are presently unable to finally quantify all loss and damage suffered by them, as Owners loss and damage is continuing, and Owners will provide further particulars thereof in due course. The types of loss and damage suffered by Owners to date are pleaded below, and expenditure to date and currently estimated further expenditure is particularised in Appendix 3 hereto.

### PARTICULARS

(1) Surveyors/Correspondents/Agents Fees

    (i)     Brookes Bell

    (ii)    SPICA

    (iii)   Wilhelmsen

(2) Discharge costs (to be incurred - estimated)

(3) Hull cleaning costs and associated expenses

(4) Legal Costs in Indonesia

46. Further the Owners are entitled to claim, and claim, an indemnity in respect of any liability they may be found to have to any entity or individual by reason of Charterers' breaches of the Charterparty as aforesaid.

47. Further the Owners claim compound interest pursuant to section 49 of the Arbitration Act 1996 on the amounts found to be due to them at such rate, and for such periods, and with such rests as the Tribunal think fit.

AND THE OWNERS CLAIM:-

(1) Under paragraph 36 US$278,204.48, alternatively damages under paragraph 37;

(2) Under paragraph 38 the indemnity there sought;

(3) Under paragraph 43 the declaration there sought;

(4) Under paragraph 44 the declaration there sought;

(5) Under paragraph 45 damages;

(6) Under paragraph 46 the indemnity there sought;

(7) Under paragraph 47 compound interest pursuant to section 49 of the Arbitration Act 1996;

(8) Such further or other relief (including but not limited to injunctive relief and orders in respect of the Cargo) as the Tribunal shall think fit;

(9) Costs

Yours faithfully,

**MILLS & CO**

# NAIAD MARITIME CO.

### Trust Company Complex,
### Ajeltake Road,
### Ajeltake Island,
### Majuro MH 96960
### Marshall Islands

To:  Messrs Pacific Gulf Shipping Company Ltd
C/o: Messrs Ace Chartering S.A. / Att: Francois Savaricas Esq.

11th November, 2015

### M/V MARYLISA V / PGSC - CP DD 21-08-15
### 4TH HIRE INVOICE

| | | | | | | Credit | Debit |
|---|---|---|---|---|---|---|---|
| *From 30th August 2015 21:30 GMT to 03rd November 2015 21:30 GMT* | | | | | | | |
| Hire | 65 | days at | 54,000 | | | | 260,000.00 |
| | | | | | | | |
| *From 03rd November 2015 21:30 GMT to 28th November 2015 21:30 GMT* | | | | | | | |
| Hire | 25 | days at | 58,000 | | | | 200,000.00 |
| | | | | | | | |
| Less Address Commission | | at | 3.75% | | | (17,250.00) | |
| | | | | | | | |
| *Bunkers on Delivery* | | | | | | | |
| HSIFO | 392.378 | MT | at | $ 285.00 | 111,827.73 | | |
| LSMGO | 66.750 | MT | at | $ 525.00 | 35,043.75 | | 146,871.48 |
| | | | | | | | |
| *Bunkers on Redelivery* | | | | | | | |
| HSIFO (Estimated) | 392.378 | MT | at | $ 285.00 | (111,827.73) | | |
| LSMGO (Estimated) | 66.750 | MT | at | $ 525.00 | (35,043.75) | (146,871.48) | |
| | | | | | | | |
| *Charterers Expenses* | | | | | | | |
| I.L.O.H.C. | | | | | 5,000.00 | | |
| C/V/E | 650 | per 15 | days | | 3,900.00 | | |
| DNV Samples Analysis Cost (50/50) | | | | | 352.00 | | |
| AMI Appointment | | | | | 1,156.50 | | |
| Charterers P&I Surveyor Accomodation at Padang | | | | | 2,205.00 | | |
| 300mt Fresh Water supplied at Padang Anchorage | | | | | 3,000.00 | | 15,613.50 |
| | | | | | | | |
| *Payments Received* | | | | | | | |
| | | 01-Sep-15 | | | (180,159.02) | | |
| | | 00-Jan-00 | | | - | (180,159.02) | |
| | | | | | | | |
| | | | | | | (344,280.50) | 622,484.98 |
| | | | | | | | |
| **BALANCE DUE TO OWNERS:** | | | | | | USD | 278,204.48 |

**Kindly remit as follows:**

The Royal Bank of Scotland
Shipping Business Centre London

**Correspondent Bank:**
Standard Chartered Bank
1095 Avenue of the Americas
New York, NY 10036, United States
Swift Code: SCBLUS33

**For the credit of:**
NAIAD MARITIME CO
IBAN CODE: GB98 RBOS 1663 0000 6467 02
IBAN BIC: RBOSGB2L

# MV Marylisa V C/P 21/08/2015 - Owners losses suffered up to 24/11/2015 and up to completion of discharge at Padang (estimated at 5 weeks)

| Description | Rate | Particulars | Amount | USD amount 1 GBP = 1.52 USD 1 SGD = 0.71 USD 1 USD = 13614.91 IDR |
|---|---|---|---|---|
| A - Surveyors/Correspondents/Agents | | | | |
| 1 - Brookes Bells personel and expenses for:<br>• Dr Martin Jonas<br>• David Myers<br>• Graham Hill<br>• Paul Davidson | UK fee rate is GBP220 per hour for office-based opinion work and GBP1950 per day for overseas survey attendances | Costs incurred up to GBP 114,115.62 and 04/11/2015 not including expenses from 13/10/2015 | GBP 114,115.62 | 173,804.36 |
| | GBP 2,600 per day | Estimated costs likely to GBP 128,400 incur from 04/11/2015 before completion of discharge in 5 weeks including estimated expenses | GBP 128,400 | 195,560.26 |
| 2 - SPICA | | | | |
| i - SPICA Jakarta costs incurred | SPICA - USD 1500 per day from 10/10/15 | Estimated costs incurred up USD 67,500 to and including 24/11/2015 | USD 67,500 | 67,500 |
| ii. SPICA Indonesia costs incurred | | Up to and including 09/11/2015 | USD 8,325.77 | 8,325.77 |
| iii- Estimated costs likely to incur before completion of discharge in 5 weeks for SPICA | | | USD 52,500 | 52,500 |

| | | | | Total |
|---|---|---|---|---|
| iii - Costs incurred for Indonesian Lawyers | Mr Lim Tean of Dyah Ersita: USD 500 per hour 3,500 per day | Estimated | USD 15,000 | 15,000 |
| ix. Future estimated costs of Indonesia Lawyers | | Estimated | USD 10,000 | 10,000 |
| 3 - Wilhelmsen | | | | |
| i - Costs incurred | | Incurred up to 19/11/2015 | USD 8,000 | 8,000 |
| ii - Estimated costs likely to incur before completion of discharge in 5 weeks | | Estimated | USD 4,000 | 4,000 |
| | | Total | USD 534,690.39 | 534,690.39 |
| B- Discharge Costs | | | | |
| 1 - Hire of Nitrogen Gas generators from PT Tangerang Gas Industri | | Hire of two generators not including tax IDR 3,120,000,000 | USD 229,160.57 | 229,160.57 |
| 2 - Shipment of generators from Padang Jetty to ship | Costs quoted separately in table A below | Hire of barge for one month including fees and expenses | USD 55,060 | 55,060.00 |
| 3 - Vessel inspection costs of Mari-Flex and Framo | Estimated. Amount to be negotiated | Including accommodation and flights, local charges + 10% any | USD 20,000 | 20,000.00 |
| 4 - Discharge costs if unloading cargo at berth * | Costs quoted separately in table B below | Estimated | USD 485,104.80 | 485,104.80 |
| 5- Anticipated Customs fines | SPICA advise these are likely below | Estimated | USD 150,000 | 150,000.00 |
| 6 - Costs of Inflammable gas tests by Intertek | Costs quoted separately in table C below | | SGD 22,425 | 16,087.26 |
| 7 - Cargo lab analysis incurred | | | USD 600 | 600.00 |
| 8 - Class fees and expenses | | Estimated | USD 3,000 | 3,000.00 |
| 9 - Superintendent fees plus disbursements | USD 750 per day | For 3 weeks Including transportation | USD 17,250 | 17,250.00 |
| 10 - Management fees | USD 30,360 monthly | | USD 30,360 | 30,360.00 |
| 11 - Victualling costs | USD 183.25 daily | For 3 weeks | USD 3,848.25 | 3,848.25 |

| Description | Rate | Particulars | Amount | Amount USD |
|---|---|---|---|---|
| 12 - Sum to be paid to Shippers for loading costs | below | Costs quoted separately in table D | IDR 2,231,766,656 | 161,812.01 |
| 13 - Sum to be paid to Shippers for stockpile rental | Estimated. Sum to be charged at cost | Maximum for 2 months | IDR 220,000,000 | 15,950.88 |
| 14 - Sum to be paid to Shippers for cargo loss | Estimated. To be assessed on discharge | | IDR 1,655,173,720 | 120,006.72 |
| 15 - Hull Cleaning | | | USD 34669.7 | 34,669.70 |
| 16 - Miscellaneous expenses | | Estimated | USD 50,000 | 50,000.00 |
| 17 - Overstay charge already incurred | USD 23.00 x 22 persons per day = USD 506.00 per day | From 3/11/2015 until 24/11/2015 | USD 11,132.00 | 11,132.00 |
| 18 - Overstay charge estimated until discharge | USD 23.00 x 22 persons per day = USD 506.00 per day | 5 weeks | USD 17,710 | 17,710.00 |
| TOTAL | | | | 1,421,752.19 |

| OVERALL TOTAL | 1,956,442.58 |
|---|---|

## Table A

### Shipment of generators from Padang Jetty to ship - PT. Bintang Samudra Utama

| Description | Rate | Particulars | Amount USD |
|---|---|---|---|
| 1. Time Charter 1 set barge | Lump sum | | |
| 2. Agency Fees | 30 days | | 2,000 |
| 3. Operational costs + port charges | | excluding fuel, agency fees, fresh water 38,000 | 650 |
| 4. Hire of shore crane to lift up container from shore on to barge | 270/container | 270 x 4 | 1,080 |
| 5. Hire of shore crane to lift up container from barge on to shore | 270/container | 270 x 4 | 1,080 |
| 6. Permit arrangement at port authority office | | | 1,500 |
| 7. Fuel/diesel oil | Lump sum for 1 month | | 10,000 |
| 8. Fresh water | Lump sum for 1 month | | 750 |

Table B

Discharge Costs of cargo at Padang - PT. Bintang Samudra Utama

| Description | Rate | Particulars | Amount USD |
|---|---|---|---|
| I. Unloading cargo at anchorage | | | |
| 1. Hire of barge (lump sum) | 21,000 per trip | Barge capacity approx 6,000 | 126,000 |
| | | MT  cargo  quantity  32,700 | |
| | | MT, need about 6 trips | |
| 2. Stevedore cost from vessel to barge | USD 2/MT | 32672 x 2 | 65,344 |
| 3.  Heavy  equipment  cost  on  vessel  at anchorage (bulldozer/excavator) | USD 1.2/MT | 32,672 x 1.2 | 39,206.40 |
| 4. Heavy equipment cost on barge at berth | USD 1.2/MT | 32,672 x 1.2 | 39,206.40 |
| 5. Stevedore cost from barge to jetty | USD 3/MT | 32,672 x 3 | 98,016 |
| 6.  Hauling/trucking  from  sea  port  to shipper stock pile abt 26 KM | USD 3.5/MT | 3.5 x 32,672 | 114,352 |
| 7.  Cargo  draft  survey  (on  vessel  at anchorage) | | | 520 |
| 8. Cargo survey (on barge at jetty) | | | 2,460 |
| | | TOTAL | 485,104.80 |
| II.  Unloading  at  berth  (from  vessel  to jetty) | | | |
| 1. Stevedoring costs | USD 4.7/MT | 32,700 x 4.7 | 153,690 |
| 2. Heavy equipment (bulldozer/excavator) | USD 1.2/MT | 32,700 x 1.2 | 39,240 |
| 3. Estimated port charges | | | 76,141.40 |
| 4. Light Dues | | | 1,025.92 |

TOTAL     55,060

TOTAL

| | | 2,000 |
|---|---|---|
| 5. Agency Call Fee | | |
| 6. 2 pairs yokohama fender | | 3,500 |
| | TOTAL | 275597.32 |

\* Assumption made at 4 above that discharge costs will be unloading at anchorage as this looks the most likely scenario. Owners are trying to negotiate unloading at berth to save costs and reduce the risk of cargo loss

Table C

Gas Sampling – Intertek

| Description | Rate | Amount SGD | Amount USD |
|---|---|---|---|
| I. Analysis | | | |
| 1. UOP539 | SGD 502 x 5 samples | 2,500 | 1,793.45 |
| 2. DHA analyser | SGD 502 x 5 samples | 2,500 | 1,793.45 |
| 3. Lowox analyser | SGD 595 x 5 samples | 2,975 | 2,134.21 |
| II. Personnel and cylinder rental | | | |
| 1. Mobilisation and demobilisation charge (flight) | SGD 1500 (per day) x 2 days | 1,000 | 717.38 |
| 2. Personnel rates | | 3,000 | 2,152.14 |
| 3. Cylinder rental | SGD 35 (per day) x 20 days x 5 cylinders | 3,500 | 2,510.83 |
| 4. Cylinder preparation/reinstatement (cleaning) fee fo 20,000 cc cylinders | SGD 50 per cylinder x 5 cylinders | 250 | 179.35 |
| III. Shipping Cost | | | |
| 1. Cylinder from Singapore to Padang via DHL estimated costs | | 700 | 502.17 |

| | | | | |
|---|---|---|---|---|
| 2. Dangerous Good (Gas) Cylinder from Padang to Singapore (20 footer container) estimated (not including tax and duties) | | 6,000 | 4,304,28 | |
| | TOTAL | | 22,425 | 16,087.26 |

Table D

**Loading Costs paid to PT. Jatim Propertindo Java**

| Description | Cost in IDR |
|---|---|
| JIB crane rental | 166,792,500 |
| Excavator rental | 85,320,000 |
| Trado rental for bring excavator | 5,760,000 |
| Trucking for loading and handling cost | 1,890,326,948 |
| Operational costs consumption, etc. During loading | 75,067,208 |
| Documentation cost | 8,500,000 |
| TOTAL in IDR | 2,231,766,656 |